# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TRAVIS L. WATSON,                          )
                                           )
              Plaintiff,                   )
                                           )
       v.                                  )          1:17cv934
                                           )
DETECTIVE MCPHATTER, et al.,               )
                                           )
              Defendants.                  )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendants' Motion for Summary Judgment" (Docket Entry 33) (the "Summary Judgment Motion"). For the reasons that follow, the Court should grant in part and deny in part the Summary Judgment Motion.

### BACKGROUND

### I.  Procedural History

Alleging violations of his rights under the Fourth Amendment, Travis L. Watson (the "Plaintiff") initiated this pro se action against Detective McPhatter, Detective Altizer, and Detective Ludemann (collectively, the "Defendants") pursuant to 42 U.S.C. § 1983. (Docket Entry 2 (the "Complaint") at 2-3.)[1] Defendants moved to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the

---

        1  Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

"Rules"). (See Docket Entry 12 (the "Dismissal Motion") at 1.) In response, Plaintiff filed a supplement to his Complaint, entitled in part "Motion to Deny Dismissal" (Docket Entry 19 (the "Supplement") at 1), which contains additional factual allegations and "is supported by the affidavits of Judy West [('Ms. West')] and Carla Morris" ("Ms. Morris") (id. at 2), as well as other exhibits (see, e.g., id.; Docket Entry 19-4 at 1). (See Docket Entry 19 at 1-6.) Because the Complaint, as amended by the Supplement, "states a plausible fourth-amendment claim against Defendants" for allegedly "exceed[ing] the bounds of a legitimate protective sweep" (Docket Entry 25 at 11) by, inter alia, "look[ing] through some mail in the living room and . . . papers inside the apartment" (id. at 10 (internal quotation marks and citation omitted)), the undersigned recommended that the Court deny Defendants' Rule 12(b)(6) request (see id. at 13). The Court (per United States District Judge Loretta C. Biggs) adopted that recommendation and denied the Dismissal Motion. (See Docket Entries 27-28.)

Thereafter, the parties engaged in discovery (see, e.g., Docket Entry 30 at 1-4 (containing Plaintiff's discovery requests); Docket Entry 38 at 1 (indicating that Defendants shared body camera recordings with Plaintiff)), after which Defendants filed their Summary Judgment Motion (see Docket Entry 33). According to the Summary Judgment Motion:

> Plaintiff claims the Defendants performed an illegal search of his apartment following his arrest on December

2

29, 2016. A review of the material facts will show that
the protective sweep of the apartment and the search
performed by the officer[s] did not violate the Fourth
Amendment rights of the Plaintiff and summary judgment is
appropriate.

(Id. at 1-2.) Plaintiff opposes the Summary Judgment Motion. (See
Docket Entries 42 to 43-5.)

## II. Allegations

In this action, Plaintiff challenges Defendants' alleged
"illegal search and seizure" (Docket Entry 2 at 3) at his apartment
on the morning of December 29, 2016 (id. at 4). According to the
Complaint, as supplemented:

Defendants, in contravention of the Fourth Amendment,
"violate[d] and disregard[ed Plaintiff's] expectation of privacy
in" the apartment where he "resided at the time of the violation."
(Docket Entry 19 at 1.) "[Plaintiff] was arrested outside of [his]
residence," and, "[a]fter [he] was handcuffed, [Defendants]
immediately enter[ed] the residence without a search warrant or
probable cause or exigent circumstances" (Docket Entry 2 at 6) or
"consent to enter or search" (id. at 5). Plaintiff's "fianc[é]e
([Ms.] Morris) and [his] mother ([Ms.] West) also were present"
during this event. (Id.)

More specifically, "[t]he police came to the [apartment] door
early on December 29, 2016. After they identified themselves,
[Plaintiff] came to the door with his hands up." (Docket Entry 19-
1, ¶ 3.) "[Plaintiff] came out of the apartment door with his

3

hands up.  The police grabbed him as soon as he was about two feet (2') outside of the apartment."  (Docket Entry 19-2, ¶ 3; <u>see also</u> Docket Entry 19-1, ¶ 3 ("The police grabbed him and took him outside of the apartment.").)    "As soon as they grabbed [Plaintiff], approximately three (3) police officers went into the apartment.  Two of the police officers stayed in the apartment and one left[.]"  (Docket Entry 19-2, ¶ 4; <u>accord</u> Docket Entry 19-1, ¶ 4.)    The police entered "right after Officer J.L. Matthews cleared the residence from the front door.  There was [sic] no reports or indications that the officers felt threatened or that they had any basis to believe that evidence was being destroyed."  (Docket Entry 19 at 2 (citation omitted).)    "Detective Matthews stood outside the door of the residence while [Defendants] detained [Ms.] Morris inside the apartment.  [Ms.] West was outside with [Plaintiff] until officers escorted [him] away . . . at approximately 8:40 a.m."  (Docket Entry 2 at 5.)

    "After the entry (without a search warrant) the search of [the] residence did not end."  (Docket Entry 19 at 2.)    "Detective Altizer physically remained in the residence" and "[t]he police kept [the] residence door open" (<u>id.</u>) with another officer standing near the apartment door "looking at the living room and what was in the living room" (Docket Entry 19-1, ¶ 9), for approximately two hours (<u>see</u> Docket Entry 19 at 3; <u>see also</u> Docket Entry 19-1, ¶¶ 6, 9).  The officers ordered Ms. Morris "to remain on the couch and

4

not to move" and "did not allow her to answer her phone." (Docket Entry 19 at 2.)[2] For "a long time" (Docket Entry 19-1, ¶ 6; Docket Entry 19-2, ¶ 6), police officers detained Ms. Morris on the couch and refused to let Ms. West enter the residence. (Docket Entry 19-1, ¶¶ 5, 8; Docket Entry 19-2, ¶ 5.) "[D]uring this time," Defendants "look[ed] through papers inside the apartment" (Docket Entry 19-2, ¶ 7) and "searched through the mail of the residence" (Docket Entry 19 at 2; accord Docket Entry 19-1, ¶ 4). "After the search had been ongoing for (2) two hours (see search warrant for verification of the execution of the warrant which was at 10:30 a.m. Search began at 8:30 a.m.), Detective W.C. Tyndall obtained a search warrant to search the residence and [P]laintiff's 1997 Acura from Magistrate Watts at 9:30 a.m. on December 29, 2016." (Docket Entry 19 at 3.) Defendants' "illegal search" resulted in the discovery and seizure of a firearm (Docket Entry 2 at 6) and caused, inter alia, "[e]motional and mental suffering" and "[j]ob loss" (id. at 5).

### III. The Record

In support of their respective positions, the parties submitted affidavits, a transcript from certain proceedings in Plaintiff's state-court criminal cases, written police records, and

---

2    Plaintiff asserts no claim on behalf of Ms. Morris regarding the legality of her detention. (See id. at 4 ("Ms. Morris is only a witness for the purposes of this civil action.").)

body camera footage from officers present at the scene of Plaintiff's arrest on December 29, 2016. As relevant to the Summary Judgment Motion, the record reflects the following:

### A. Plaintiff's Apartment Layout

Plaintiff, his fiancée, Ms. Morris, and their pet pitbull, Sincere, resided in a two-story apartment building that contained eight units. (See, e.g., Altizer Video at 13:46-13:47, 13:59-14:01, 14:31.)[3] Separate stairways divided the apartments into two distinct groups, each containing a set of two upper and two lower units. (See id. at 13:46-13:47.) Individual walkways extended from a sidewalk adjoining the parking lot directly to the door of each of the lower units. (See id.) A flight of stairs terminated a little more than halfway down each walkway. (See id.) For each grouping, the top of these flights of stairs formed a joint landing from which a combined flight of stairs rose to an entranceway for the (two) second-floor apartments. (See id.) As one faced the building from the parking lot,[4] Plaintiff and Ms. Morris resided in the lower left apartment unit of one such grouping. (See id.)

_____

3  Defendants submitted a compact disc "containing fourteen recordings captured by body worn cameras worn by law enforcement officers with the Greensboro Police Department who participated in the apprehension, arrest and search of the apartment at which Plaintiff was living on December 29, 2016." (Docket Entry 38 at 1.) This Recommendation refers to those video recordings using the relevant officer's name and the video timestamp.

4  For ease of reference, the same perspective governs all directional information in this Recommendation.

6

The front door on their one-bedroom apartment opened into a large room, with the kitchen on the right, the living room on the left, and a doorway to the bedroom straight ahead. (See id. at 13:54-13:56; Matthews Video at 13:55; see also Docket Entry 43-1 at 17, 39.) Immediately inside the bedroom door on the right appeared the bathroom, followed by a walk-in closet. (See Altizer Video at 13:55-13:56; Matthews Video at 13:55; see also Docket Entry 43-1 at 17.) The apartment door opened to the right, directly across from the kitchen bar, with a long table containing a stereo and television set immediately to the left as one entered. (See Altizer Video at 13:55-13:57, 14:04; Matthews Video at 13:55-13:56; see also Docket Entry 43-1 at 17, 39, 45.) The living room contained two couches, one on the far left wall, which ran parallel to the kitchen bar, and one on the bedroom wall, opposite the table with the television, as well as an armchair in front of the kitchen bar, opposite the first couch. (See Altizer Video at 14:00-14:03; Matthews Video at 13:55-13:56.)

**B. Relevant Events**

On December 22, 2016, a Greensboro Family Dollar Store "was robbed at gunpoint by a black male in his late 30's to early 40's wearing a hooded shirt, sunglasses and donning a wig fashioned with braids or dreadlocks." (Docket Entry 36 at 9.) Two days later, Greensboro Police Officers responded to reports of an assault at Plaintiff's apartment building. (Id.) According to the affidavit

underlying a subsequent search warrant for Plaintiff's apartment and car:

The victim of the alleged assault, Plaintiff's brother Patrick Marshall, reported that Plaintiff (1) had assaulted him and (2) lived in the apartment below Marshall's apartment. (See id.) Per the EMT who treated Marshall for injuries at the scene:

> while [the EMT] was treating Patrick Marshall for his injuries Marshall stated that his brother, [Plaintiff], robbed the Family Dollar and wore a wig while doing so. Marshall went on to tell the EMT that the clothes, wig and the handgun that were used in the robbery were [in Plaintiff's] apartment which is directly below Patrick Marshall's apartment.

(Id. at 10.) Based on this report and subsequent photograph identifications, the officer investigating the robbery, Detective William Tyndall, obtained a warrant for Plaintiff's arrest for Robbery with a Dangerous Weapon. (Id.)

"Based on [Plaintiff's] criminal history and the nature of the crime, the Violent Criminal Apprehension Team [(the 'VCAT')] was assigned to apprehend [Plaintiff]." (Id., ¶ 6.) Detective Tyndall "provided Detective Altizer with the information and also informed her that if [Plaintiff] was arrested at [his apartment], [Detective Tyndall] would be seeking a search warrant for the apartment." (Id.) Detective Tyndall prepared a search warrant in anticipation of Plaintiff's arrest. (See id., ¶ 7.)

8

At approximately 8:46 a.m.[5] on December 29, 2016, VCAT officers approached Plaintiff's apartment to arrest him on the outstanding warrant. (See, e.g., Altizer Video at 13:46-13:47; Docket Entry 43-1 at 12-14.) Officers knocked on the apartment door and, after a few minutes' delay, during which, inter alia, officers continued to knock, engaged in verbal exchanges with Plaintiff, and repeatedly ordered Plaintiff to answer the door, Plaintiff opened the apartment door and stood with his hands in the air inside the apartment. (See, e.g., Altizer Video at 13:47-13:53; Docket Entry 43-1 at 13-14, 43.) The officers ordered Plaintiff to exit the apartment and get on the ground. (See, e.g., Altizer Video at 13:53; Docket Entry 43-1 at 13-14, 43.) As Plaintiff exited the apartment, he lowered his hands and officers on either side of the door grabbed his wrists as he exited. (See, e.g., Altizer Video at 13:53.) Plaintiff laid down on the ground a foot or two from the apartment threshold while officers handcuffed his arms behind his back. (See, e.g., id.; Graham Video at 13:53.) As officers handcuffed Plaintiff, Detective Altizer initially ordered Ms. Morris to close the apartment door to prevent Sincere's exit, but, before Ms. Morris complied, Detective Altizer

---

5 The timestamp on the body camera footage reflects Universal Coordinated Time. (See Docket Entry 37, ¶ 6.) To calculate Eastern Standard Time, subtract five hours. (See, e.g., Altizer Video at 13:55 (reflecting time of 8:55 on pictured cellphone); Ludemann Video at 14:56 (reflecting time of 9:54 on pictured cellphone).)

directed her to instead leave the door open and restrain Sincere. (See, e.g., Altizer Video at 13:53.)

Detective Ludemann and another officer, M. Graham, handcuffed Plaintiff while Detective McPhatter positioned himself on the walkway between Plaintiff and the entrance to the stairs. (See, e.g., Graham Video at 13:53.) After Graham helped Plaintiff to his feet, Graham and Detective McPhatter walked Plaintiff to the stairs outside his apartment, where they told him to take a seat. (See, e.g., id. at 13:53-13:54.) Detective McPhatter then walked up the walkway towards the parking lot to speak with Plaintiff's mother, Ms. West, who had arrived on the scene from her nearby apartment. (See, e.g., id. at 13:55; McPhatter Video at 13:55-13:57.) Next, Detective Ludemann radioed for a patrol car to come collect Plaintiff, after which Plaintiff's mother and Detective McPhatter approached the stairs where Plaintiff remained seated. (See, e.g., Graham Video at 13:55-13:58.) Shortly after Plaintiff's mother left to retrieve socks from her nearby apartment, Detective Ludemann, at Graham's request, went to the parking lot to get leg cuffs for Plaintiff. (See, e.g., id. at 13:58-14:00.)

Meanwhile, as officers finished handcuffing Plaintiff, Detective Altizer asked Ms. Morris through the apartment's open door whether anyone else remained in the apartment and Ms. Morris indicated that nobody did. (See, e.g., Altizer Video at 13:53.) At Detective Altizer's requests, Ms. Morris agreed that Detective

10

Altizer could both enter the apartment to speak with her and check the apartment to confirm that it remained empty. (See, e.g., Altizer Video at 13:54; Docket Entry 43-1 at 15-16, 25, 44.) Detective Altizer asked Ms. Morris to sit on the couch (see Altizer Video at 13:54) before Detective Altizer, Detective Ludemann, and Detective J.L. Matthews quickly cleared the apartment (see id. at 13:55; Ludemann Video at 13:55; Matthews Video at 13:55; Docket Entry 39, ¶ 5; see also Docket Entry 43-1 at 44 (agreeing, in Ms. Morris's state-court testimony, that it took "30 seconds or maybe even less for" officers "to look through the whole apartment")).[6]

As soon as they finished clearing the apartment, the three officers permitted Ms. Morris to retrieve shoes from the bedroom closet and take them out to Plaintiff. (See, e.g, Altizer Video at 13:55-13:57.) While Ms. Morris engaged in this errand, Detective Ludemann exited the apartment and Detective Altizer telephoned Detective Tyndall regarding the arrest and anticipated search warrant. (See, e.g., id. at 13:56; Docket Entry 35, ¶ 6; Docket Entry 36, ¶ 7; see also Docket Entry 19-2, ¶ 4 (averring: "As soon as they grabbed [Plaintiff], approximately three (3) police officers went into the apartment. Two of the police officers

---

6  A fourth officer, S. Friel, entered the apartment near the end of the sweep, asking whether they were "good." (See, e.g., Matthews Video at 13:55.) When told that they were "good for people," he exited the apartment. (See, e.g., id.)

stayed in the apartment and one left[.]").)[7] When Ms. Morris
returned, Detective Altizer told her to retake her seat on the
couch, prompting Ms. Morris to sit in roughly the middle of the
couch on the left wall. (See, e.g., Altizer Video at 13:57-14:00.)
Detective Altizer explained that they had arrested Plaintiff for a
robbery and that the detective who had investigated the robbery was
"getting a search warrant signed right now, so [the officers were]
just in kind of a holding pattern right now [and] were going to
hang out right here until he gets here." (Id. at 13:57-13:58.)
During this exchange, Detective Matthews stationed himself just
outside and to the right side of the apartment door, diagonally
across from Ms. Morris, a position he generally maintained for the
duration of the recordings made before Detective Tyndall's arrival.
(See, e.g., McPhatter Video at 13:57-14:24; Altizer Video at 13:57-
14:00, 14:24-14:39.) In this position, Detective Matthews largely
remained in Ms. Morris's line of sight. (See, e.g., Matthews Video
at 14:07; Altizer Video at 14:07; Friel Video at 14:07.) Soon
thereafter, another officer, S. Friel, stationed himself opposite
Detective Matthews, to the left of the apartment door. (See, e.g.,
McPhatter Video at 13:59-14:00; Matthews Video at 13:59-14:00.)

Following her conversation with Ms. Morris, Detective Altizer
generally remained either a few feet inside or just outside the

_____

7 At 9:21 a.m., Detective Tyndall called Detective Altizer to
report that "he[ wa]s at the courthouse right now." (Altizer Video
at 14:21.)

12

apartment door, save for a few trips to her car or to speak with individuals outside the apartment. (See Altizer Video at 13:57-14:39.) However, at approximately 9:15 a.m., Detective Altizer moved to briefly stand near the kitchen island. (See id. at 14:14-14:15.) It appears that Ms. Morris remained looking downward with her hand in front of her eyes for at least the first part of the time that Detective Altizer stood near the kitchen island. (See id.) The reflection in a mirror over the couch where Ms. Morris remained seated shows Detective Altizer looking downwards towards the contents on the kitchen bar when she approached the bar. (See id. at 14:14.) The recording does not show the mirror for the entire (brief) period that Detective Altizer remained near the kitchen bar, but the subsequent portions captured on video appear to show Detective Altizer either looking towards the door or towards Ms. Morris, with her hands generally on or near her police vest. (See id. at 14:14-14:15.)[8]

In the interim, after Ms. Morris brought Plaintiff shoes, Plaintiff objected to the officers' failure to either inform him of

_____

[8] As a general matter, given the body camera's position on Detective Altizer's vest, Detective Altizer's hands largely remained outside the range of her body camera footage. (See generally Altizer Video 13:46-14:39.) Nonetheless, on a few occasions, it appears that Detective Altizer silenced Ms. Morris's ringing cellphone, which lay beside the stereo on the table inside the entrance door. (See id. at 14:03, 14:10; see also id. at 14:14 (showing part of Detective Altizer's hand silencing cellphone); Matthews Video at 14:03 (showing Detective Altizer picking up cellphone from table to show to Ms. Morris).)

13

the charges underlying his arrest or show him the arrest warrant. (See, e.g., Graham Video at 13:56-13:59.) Plaintiff objected that the officers were not "showing [him] that [he had] rights," as they remained standing inside his apartment and had made him come outside, without showing him a warrant. (See, e.g., id. at 13:59.) He also asked if the officers were "detaining [Ms. Morris] too," in response to which Graham explained that they were "basically holding down [Plaintiff's] apartment [be]cause the Detective [who obtained Plaintiff's arrest warrant] wants to do a search warrant [t]here." (Id. at 14:00-14:01.) As the officers did not possess a search warrant, Plaintiff wanted to know "why [they] were bothering [Ms. Morris]." (Id. at 14:01.) Officers responded that the search warrant was "on its way" and that they could "lock [the apartment] down" and were "not doing anything wrong." (Id.)

Detective McPhatter and Graham then adjusted Plaintiff's handcuffs to make them more comfortable, during which process Ms. West returned from her apartment. (See, e.g., id. at 14:02-14:04.) Plaintiff told his mother that the officers "ain't even got no search warrant or nothing" and had not told him why they were arresting him. (Id. at 14:03.) After the officers declined to answer his mother's question about the reason for his arrest, Plaintiff stated that, "if they ain't got no warrant, they need to leave, Ma." (Id.) Detective McPhatter, Ms. West, and Plaintiff then discussed the situation, with Detective McPhatter explaining

14

that Detective Tyndall was bringing a search warrant and the officers were not leaving until he arrived. (See, e.g., id. at 14:04-14:06.)

At that point, the patrol car arrived and Plaintiff and Ms. West asked if Ms. Morris could come hug Plaintiff before he left. (See, e.g., id. at 14:06.) Graham said that she could (see id.), but Detective Altizer vetoed that idea (see id. at 14:06-14:07; see also Altizer Video at 14:06-14:07). Graham then walked Plaintiff over to the patrol car, where Detective Ludemann stood speaking with the patrol car's driver, Corporal Sink. (See Graham Video at 14:07.) Graham explained to Corporal Sink that they "[wi]ll be down there in a minute . . . . It's just [that Plaintiff] has a lot of family here in close proximity." (Id. at 14:08.) As they walked back towards the apartment, Graham suggested to Detective Ludemann that one of them follow the patrol car, and then informed Detective McPhatter, who stood talking to Plaintiff's mother between the stairway and the sidewalk, that Graham was "going to run down there with [the patrol car]." (Id.)

While Graham and Detective Ludemann engaged with the patrol car, Detective McPhatter remained on the walkway between the stairs and the sidewalk speaking with Ms. West. (See McPhatter Video at 14:07-14:09.) Ms. West then walked to the sidewalk to speak with her cousin and Detective McPhatter walked back towards the stairway, where he briefly spoke with Detective Ludemann before Ms.

15

West returned for further conversation with Detective McPhatter before turning and walking away towards her apartment. (See id. at 14:09-14:14.) Detective McPhatter then briefly stationed himself on the left side of the walkway at the stairway, across from Detective Ludemann, before leaving to move his car into a parking spot. (See id. at 14:14-14:19.) When Detective McPhatter returned, he stood on the right side of the walkway at the stairs and Detective Ludemann took his previous position on the left side of the walkway. (See id. at 14:19-14:24.) Detective McPhatter maintained this basic position for the duration of the body camera recordings made before the arrival of Detective Tyndall with the search warrant. (See id. at 14:19-14:24; Friel Video at 14:20-14:33; Altizer Video at 14:20-14:39.) For his part, Detective Ludemann also kept the same position until 9:39 a.m., when he took Friel's prior station outside the left side of the apartment door. (See McPhatter Video at 14:19-14:24; Friel Video at 14:20-14:33; Altizer Video at 14:20-14:39.) From her position on the couch, Ms. Morris could not see Detective McPhatter or Detective Ludemann outside the apartment. (See, e.g., Altizer Video at 14:09-14:10, 14:29-14:30.)

In the interim, at 9:30 a.m., Ms. West went upstairs, to the apartments above Plaintiff's apartment. (See Friel Video at 14:30.) She came back downstairs at 9:32 a.m. (see id. at 14:32), and came over to the walkway to speak to a newly arrived officer at

9:35 a.m. (see Altizer Video at 14:35.) After that officer informed her that he did not have the search warrant, Ms. West asked Detective Altizer if Ms. Morris remained well. (See id.) Upon receiving an affirmative response, Ms. West walked away in the direction of her apartment. (See id.)

Shortly thereafter, Detective Altizer turned off her body camera. (See id. at 14:39.) The other officers on the scene had already turned off their body cameras. (See Friel Video at 13:54, 14:33; Graham Video at 14:09; Ludemann Video at 13:56; Matthews Video at 13:54, 14:10; McPhatter Video at 14:24; see also Sink Video at 14:09 (departing premises).) The earliest body camera recordings resume at 9:54 a.m., following Detective Tyndall's arrival. (See Ludemann Video at 14:54; Matthews Video at 14:54; see also Altizer Video at 14:58.) As such, a fifteen-minute gap appears in the video recordings from the scene. Detective Altizer avers that, during this gap, she remained "standing outside or right in the threshold of the apartment awaiting the arrival of Detective Tyndall." (Docket Entry 35, ¶ 10.)

In sum, on the video recordings made prior to Detective Tyndall's arrival, only Detective Altizer, Detective Ludemann, Detective Matthews, and Friel enter Plaintiff's apartment. Further, after he departs the apartment at the end of the protective sweep, Detective Ludemann remains outside the apartment and outside Ms. Morris's line of sight for the duration of that

17

footage.  However, Detective Altizer and Detective Matthews generally remain in or near the apartment door, largely within Ms. Morris's range of vision from her seat on the couch.  Finally, the recordings identify Detective Altizer as the only female among the VCAT officers.

In addition to the foregoing, the record reflects the following sworn testimony from Ms. West, Ms. Morris, and Detective Altizer.  First, according to Detective Altizer's state-court testimony, after clearing the apartment and while awaiting Detective Tyndall's arrival, she did not search anything or observe any other officer searching anything, including during the period when her body camera remained deactivated.  (See Docket Entry 43-1 at 18-22.)  However, according to Ms. West:

"As soon as the[ officers outside the apartment] grabbed [Plaintiff], approximately three (3) police officers went into the apartment.  Two of the police officers stayed in the apartment and one left[.]"  (Docket Entry 19-2, ¶ 4.)  "The two (2) police officers stayed in the apartment the entire time until the police officer came with the warrant.  The police kept the door to the apartment open.  [Ms. West] saw these police officers were looking through papers inside the apartment during this time."  (Id., ¶ 7.) Detective Altizer (whom Ms. West identified at the state-court suppression hearing as "the officer lady right there") and a "male officer were inside of the apartment checking the mail."  (Docket

18

Entry 43-1 at 38.)  More specifically, Detective Altizer and her
male colleague looked through mail on the kitchen bar for "a few
minutes" (id. at 39) approximately five minutes after the patrol
car took Plaintiff away.  (See id. at 38-42; see also id. at 42
("They just had the mail in their hand looking at the mail.  And
then [Ms. West] was talking to the officers outside and asking them
what was going on.").)

Finally, according to Ms. Morris:

Shortly after police officers grabbed Plaintiff, "two police
officers came into the apartment.  One was female and one was male.
They looked through some mail in the living room."  (Docket Entry
19-1, ¶ 4.)  This involved them "picking through[] . . . kind of a
stack of mail laying, just looking through it, looking at names.
That's what they were doing."  (Docket Entry 43-1 at 46.)  "The
female police officer stayed in the apartment the entire time while
[they] waited.  The male police officer went out the apartment door
but they kept the door open and [Ms. Morris] could see him and he
could see [her] and into the apartment the entire time."  (Docket
Entry 19-1, ¶ 7.)[9]  Although Ms. Morris did not observe Detective
Altizer searching anything "[w]hen she came into the apartment" at
first following the protective sweep, "at least about 30 to 40
minutes" after the patrol car took Plaintiff away, Detective

_____

9    In her state-court testimony, Ms. Morris clarified that
Detective Altizer was "in and out" of the apartment, but "was there
permanently the whole time."  (Docket Entry 43-1 at 48.)

Altizer searched "the mail." (Docket Entry 43-1 at 46.) Finally, although Ms. Morris gave Detective Altizer permission to conduct a protective sweep of the apartment, she did not authorize any other search. (See id. at 46-47.)

**DISCUSSION**

## I. Relevant Standards

### A. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc)

20

(brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)).  If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper."  Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment."  Lewis v. Eagleton, No. 4:08cv2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment).  Finally, factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury.  See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

## B. Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. As the United States Supreme Court has explained, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (internal quotation marks omitted). As such, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). Nevertheless, "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Kentucky v. King, 563 U.S. 452, 459 (2011) (certain internal quotation marks omitted). Accordingly, the Supreme Court has specified certain "narrow and well-delineated exceptions to the warrant requirement," Flippo v. West Va., 528 U.S. 11, 13 (1999), including "a well-settled protective sweep exception to the warrant requirement, as enunciated by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325 (1990)," United States v. Jones, 667 F.3d 477, 482 (4th Cir. 2012) (parallel citations omitted).[10]

---

10  "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and
(continued...)

As the Supreme Court has explained, "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Buie, 494 U.S. at 327. In such circumstances, the Fourth Amendment permits a protective sweep "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." Id. (internal quotation marks, brackets, and citation omitted). Importantly, though, the Supreme Court has

> emphasize[d] that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

Id. at 335-36 (footnote omitted); see also id. at 335 n.3 ("A protective sweep is without question a 'search,' as was the patdown in Terry[ v. Ohio, 392 U.S. 1, 16 (1968)]; they are permissible on less than probable cause only because they are limited to that

---

10(...continued)
probable cause is a search that is conducted pursuant to consent."
Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

23

which is necessary to protect the safety of officers and others."). Finally, a protective sweep remains permissible even if police arrest an individual "just outside the residence." Jones, 667 F.3d at 485 n.10.

## II. Analysis

## A. Preliminary Matters

In moving for summary judgment, Defendants failed to address Plaintiff's evidence regarding the search of his apartment prior to the search warrant's arrival. Instead, they argued (in full):

> III. Defendants are entitled to summary judgment on the issue of the actual search of Plaintiff's apartment as it was pursuant to the execution of a search warrant obtained thirty six minutes after Plaintiff's arrest and served on a tenant of the apartment approximately one hour after Plaintiff's arrest.
>
> Plaintiff alleges that the search of his apartment is illegal as it was performed prior to the search warrant being granted or served. [Doc. 19, p. 6] However a review of the material facts show the search of Plaintiff's apartment was pursuant to a search warrant signed by a Magistrate at 9:30 a.m., after Plaintiff's arrest at 8:53 a.m. [Tyndall Affidavit, p. 3-4 ¶7-8] The search warrant was presented to [Ms.] Morris at the apartment at approximately 10:00 a.m. [Tyndall Affidavit, p. 4, ¶ 9] The search was completed by 10:30 a.m. [Tyndall Affidavit, p. 4, ¶ 9] This search was carried out with a valid search warrant and therefore carries a presumption of legality. *Anglin v. Director*, 439 F.2d 1342, 1346 (4th Cir. 1971)[.] Therefore, Defendants are entitled to summary judgment on this issue.

(Docket Entry 34 at 10.)

Even when Plaintiff opposed summary judgment on the grounds that Defendants "search[ed his] papers (see Judy West Affidavit and

24

Carla Morris Affidavit _ Plaintiff's Motion to Deny Dismissal)"
(Docket Entry 42 at 4; see also id. at 5 (asserting Defendants
violated Plaintiff's rights by searching papers without a warrant),
7 (same)), Defendants only minimally engaged with this issue (see
generally Docket Entry 44). Specifically, on this front,
Defendants responded, in full, as follows:

> Plaintiff contends in his response that Defendants
> violated his Fourth Amendment rights to privacy while
> "looking through papers" while waiting on the search
> warrant. [Doc. 42, p. 5 of 8] Defendants have provided
> recordings from all the officers present at the scene
> which shows the actions of the officers. [Doc. # 38
> Notice of Manual Filing; Doc. # 37 Affidavit of Adam
> Bell]

(Docket Entry 44 at 4.)

Notwithstanding the cursory nature of Defendants' argument on
this point, the Court may consider the fact that (as detailed
above) the body camera recordings conclusively establish that
neither Detective McPhatter nor Detective Ludemann committed the
alleged illegal search of Plaintiff's mail. See Fed. R. Civ. P.
56(f)(2) (permitting courts to enter summary judgment even "on
grounds not raised by a party").[11] Under these circumstances, the

---

11 The Court must provide "notice and a reasonable time to
respond" before granting summary judgment "on grounds not raised by
a party." Fed. R. Civ. P. 56(f)(2). Given that objective evidence
conclusively establishes the propriety of summary judgment for
Detective McPhatter and Detective Ludemann, to the extent
necessary, this Recommendation provides the requisite notice and
opportunity. See generally Scott v. Harris, 550 U.S. 372, 380
(2007) (instructing courts to disregard for summary judgment
purposes any version of events that "is blatantly contradicted by
(continued...)

Court should grant Detective McPhatter and Detective Ludemann summary judgment on Plaintiff's fourth-amendment claim.

**B. Detective Ludemann and Detective McPhatter**

The Complaint names Detective Ludemann and Detective McPhatter as defendants in this action (Docket Entry 2 at 1-3) and asserts that "[D]etective McPhatter, [D]etective Altizer, and [D]etective Ludemann[] did enter" Plaintiff's residence "without a search warrant and illegally obtained property" (id. at 5; see id. at 6 (same); see also id. at 5 (asserting that "Detective Matthews stood outside the door of the residence while detectives McPhatter, Altizer, and Ludemann detained [Ms.] Morris inside the apartment" (superscript omitted))). However, these unsworn assertions do not qualify as evidence for summary judgment purposes, see Reeves, 2011 WL 4499099, at *5 n.14, and none of Plaintiff's evidence identifies Detective McPhatter and Detective Ludemann as the police officers involved in any allegedly improper search of Plaintiff's mail (see Docket Entries 19-1 to 19-7, 43-1 to 43-5). Instead, construed in the light most favorable to Plaintiff, the evidence reflects only that some male officer who participated in the protective sweep of Plaintiff's apartment searched Plaintiff's mail and papers prior to the search warrant's arrival. (See Docket Entries 19-1, 19-2, 43-1.)

---

11(...continued)
the record, so that no reasonable jury could believe it").

For instance, Ms. West's affidavit reflects, in relevant part:

2. On December 29, 2016, [Ms. West] was living two doors away from [Plaintiff], [her] son, and [Ms.] Morris who lived at [a certain apartment].

3. [Ms. West] saw [Plaintiff] came out of the apartment door with his hands up. The police grabbed him as soon as he was about two feet (2') outside of the apartment.

4. As soon as they grabbed [Plaintiff], approximately three (3) police officers went into the apartment. Two of the police officers stayed in the apartment and one left[.]

5. The police officers told [Ms. Morris] to stay on the couch and not to move. They would not let [Ms. West] into the apartment.

6. It was a long time latter [sic] before another officer came with a warrant.

7. The two (2) police officers stayed in the apartment the entire time until the police officer came with the warrant. The police kept the door to the apartment open. [Ms. West] saw these police officers were looking through papers inside the apartment during this time.

(Docket Entry 19-2, ¶¶ 2-7 (emphasis added).)[12]  This search, according to Ms. West's state-court testimony, occurred about five minutes after officers took Plaintiff away in the patrol car. (See Docket Entry 43-1 at 41-42.)

Similarly, the affidavit of Ms. Morris states, in relevant part:

2. On December 29, 2016, [Ms. Morris] was living with [Plaintiff] at [a certain apartment].

---

12  In her state-court testimony, Ms. West described these two officers as "the officer lady right there [i.e., Detective Altizer] and the male officer." (Docket Entry 43-1 at 38.)

27

3. The police came to the door early on December 29, 2016. After they identified themselves, [Plaintiff] came to the door with his hands up. The police grabbed him and took him outside of the apartment.

4. Shortly afterwards, two police officers came into the apartment. One was female and one was male. They looked through some mail in the living room.

5. The police officers ordered [Ms. Morris] to sit on the couch and not to move.

6. [They] waited for a long time until an older, male police officer came with some papers.

7. The female police officer stayed in the apartment the entire time while [they] waited. The male police officer went out the apartment door but they kept the door open and [Ms. Morris] could see him and he could see [her] and into the apartment the entire time.

8. The police officers made [Ms. Morris] stay on the couch while [they] waited. They would not let [her] move from the couch. [Ms. Morris's] phone rang but they told [her] not to answer it.

9. The female and male police officers kept control of [Ms. Morris] and the apartment during the entire time [they] waited. They were both looking at the living room and what was in the living room during the entire time [they] waited.

(Docket Entry 19-1, ¶¶ 2-9.) Ms. Morris further testified that the search of the mail occurred approximately "30 to 40 minutes" after the officers "had removed [Plaintiff] from the scene." (Docket Entry 43-1 at 46; see also id. at 45-46 (reflecting that search occurred after "the protective sweep at the apartment" and while awaiting Detective Tyndall's arrival).)

The undisputed evidence reflects that Detective McPhatter did not participate in the protective sweep of Plaintiff's apartment.

28

(See McPhatter Video at 13:54-13:57; Docket Entry 35, ¶ 5; Docket Entry 39, ¶ 5.) Further, for the duration of the body camera recordings made before Detective Tyndall's arrival, Detective McPhatter remained outside Plaintiff's apartment (and outside of Ms. Morris's line of sight). (See, e.g., McPhatter Video at 13:45-14:24; Altizer Video at 14:24-14:39.) Accordingly, the evidence conclusively excludes Detective McPhatter as "[t]he male police officer" who, construing the evidence in the light most favorable to Plaintiff, searched Plaintiff's mail and/or papers without a search warrant. The Court should therefore grant summary judgment to Detective McPhatter. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In contrast to Detective McPhatter, the evidence establishes that Detective Ludemann participated in the protective sweep. (See, e.g., Matthews Video at 13:55-13:56; Docket Entry 35, ¶ 5; Docket Entry 39, ¶ 5.) However, the undisputed evidence also reflects that Detective Ludemann left the apartment about a minute after the protective sweep, before the time of the challenged searches. (See Altizer Video at 13:56; Matthews Video at 13:56-13:57; see also Docket Entry 43-1 at 38-42, 46.) In other words,

29

of the "approximately three (3) police officers [who] went into the apartment," the evidence conclusively identifies Detective Ludemann as the "one [who] left." (Docket Entry 19-2, ¶ 4.) The record further reflects that, following his departure from the apartment, Detective Ludemann remained outside the apartment and out of Ms. Morris's sight for the duration of the body camera footage made before Detective Tyndall's arrival. (See, e.g., McPhatter Video at 13:57-14:24; Altizer Video at 13:56-14:39.)[13] As such, the evidence also definitively excludes Detective Ludemann as "[t]he male police officer" who, construing the evidence in the light most favorable to Plaintiff, searched Plaintiff's mail and/or papers without a search warrant. The Court should therefore grant summary judgment to Detective Ludemann. See Scott, 550 U.S. at 380.[14]

_____

13 This footage covers the time period in which Ms. West reported the mail search occurred. (See Docket Entry 43-1 at 38-42; McPhatter Video at 14:06-14:24.)

14 To the extent that Plaintiff challenges Detective Ludemann's participation in the protective sweep itself (see Docket Entry 42 at 2-4), that challenge fails. The undisputed evidence shows that Ms. Morris authorized the protective sweep. (See, e.g., Altizer Video at 13:54; Docket Entry 43-1 at 15-16, 25, 44.) In his summary judgment opposition, Plaintiff contends that he objected to the VCAT officers' entry into his apartment prior to Ms. Morris's consent. (See Docket Entry 42 at 3; see also id. at 2 (asserting that, "after Plaintiff was arrested outside and handcuffed, and officers immediately began to enter, the Plaintiff told them to exit if they did not have a search warrant" (citing Altizer Video)).) Plaintiff's unsworn assertions in his opposition do not constitute evidence, see Reeves, 2011 WL 4499099, at *5 n.14, and the video recordings reflect more ambiguity in Plaintiff's statements regarding the VCAT officers' presence than his opposition acknowledges (see, e.g., Graham Video at 13:56-
(continued...)

In sum, the record conclusively identifies Detective Matthews, rather than Detective Ludemann or Detective McPhatter, as the "male officer" whom Ms. West and Ms. Morris described as searching Plaintiff's mail and/or papers prior to Detective Tyndall's arrival with the search warrant. As such, Plaintiff's fourth-amendment claims against Detective McPhatter and Detective Ludemann cannot survive summary judgment. See Scott, 550 U.S. at 380.

## C. Detective Altizer

However, the same result does not hold for Detective Altizer, the only female among the VCAT officers involved in the events at Plaintiff's apartment on December 29, 2016. (See, e.g., Altizer Video at 13:46-14:39, 14:58-15:32.) To begin, Ms. Morris averred that a female officer searched Plaintiff's mail while awaiting the search warrant's arrival. (See Docket Entry 19-1, ¶¶ 4-7, 9.) In addition, in their state-court testimony, both Ms. Morris and Ms. West specifically identified Detective Altizer as a participant in the search of Plaintiff's mail prior to the search warrant's arrival. (See Docket Entry 43-1 at 38-40, 44-47.)

---

14(...continued)
14:06). In any event, the officers had already completed their protective search and Detective Ludemann had already exited the apartment prior to Plaintiff raising any concerns regarding their presence in the apartment. (See id.; see also Altizer Video at 13:53-13:56.) Accordingly, Plaintiff lacks a viable fourth-amendment claim regarding Detective Ludemann's (and, for that matter, Detective Altizer's) participation in the protective sweep.

Moreover, Ms. Morris testified that the search occurred "at least about 30 to 40 minutes" after the police "removed [Plaintiff] from the scene." (Id. at 46.) The body camera recordings reflect that the patrol car took Plaintiff away at approximately 9:09 a.m. (see Graham Video at 14:09), which would mean the asserted search occurred around 9:39 a.m. to 9:49 a.m. (Docket Entry 43-1 at 46). No video evidence exists from the scene for all but a few seconds of this period. Accordingly, at least with respect to the search that Ms. Morris identified, objective evidence cannot resolve the dispute between Ms. Morris's testimony and Detective Altizer's testimony. Cf. Scott, 550 U.S. at 380.

Nor, although it remains a closer question, does the evidence "blatantly contradict[]," id., Ms. West's testimony regarding Detective Altizer. Admittedly, the video evidence confirms that no male officer entered Plaintiff's apartment during the time period when Ms. West testified that Detective Altizer and her male colleague "had the mail in their hand looking at the mail" (Docket Entry 43-1 at 42) on the kitchen bar. (See Altizer Video 14:00-14:39; McPhatter Video 14:00-14:24; Friel Video at 14:01-14:33; Docket Entry 43-1 at 38-42.) The video recordings further reflect both that Ms. West walked away from the scene around the time that Detective Altizer approached the kitchen bar and that, for at least part of the time Detective Altizer remained near the kitchen bar, she kept her hands at or near her vest, devoid of mail. (See

32

Altizer Video at 14:13-14:15; McPhatter Video at 14:13-14:15.)
Finally, Ms. Morris testified that Detective Altizer did not search
Plaintiff's apartment when she first came to stand in it.
(<u>See</u> Docket Entry 43-1 at 46.)

Nevertheless, the video evidence, which does not show Ms.
West's location or Detective Altizer's hands and actions for the
entire period in question, does not clearly disprove Ms. West's
testimony regarding Detective Altizer. (<u>See</u> Altizer Video at
14:13-14:15; McPhatter Video at 14:13-14:15.) In addition, the
video recordings reflect that Ms. Morris remained looking downward,
with her hand in front of her eyes, during at least part of the
time Detective Altizer remained near the kitchen bar (<u>see</u> Altizer
Video at 14:13-14:15), a potential reason for the discrepancy
between Ms. Morris's and Ms. West's description of events. In any
event, because the video recordings do not "blatantly contradict[]"
Ms. West's "version of events," <u>Scott</u>, 550 U.S. at 380, the Court
cannot completely discount her testimony for summary judgment
purposes. <u>See, e.g.</u>, <u>Kane v. Beaufort Cty. Sheriff's Dep't</u>, No. CA
9:14-508, 2015 WL 404570, at *5 (D.S.C. Jan. 29, 2015) ("[B]ecause
certain relevant details of the encounter are not visible on the
video available, and because they are not offered as true by the
[p]laintiff, the Court cannot rely on [the d]efendants' description
of the events for purposes of its summary judgment analysis."); 
<u>Godfrey v. Faulkner</u>, No. 7:13cv454, 2015 WL 302841, at *4-5 (W.D.

Va. Jan. 23, 2015) (denying summary judgment where "[t]he video footage in the record . . . is not so entirely inconsistent with [the plaintiff's] account of the officers' conduct that [the court] can completely discount his version of events" and "the video cameras did not record all events").

Accordingly, a material factual dispute exists regarding whether, without consent, Detective Altizer (twice) searched through Plaintiff's mail (A) after Plaintiff's removal from the scene, (B) after clearing the apartment for other people, and (C) prior to the arrival of a search warrant, a dispute which, if resolved against Detective Altizer, would support a finding that she violated the Fourth Amendment. See Buie, 494 U.S. at 335-36; Payton, 445 U.S. at 586 ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." (internal quotation marks omitted)); United States v. Laudermilt, 677 F.3d 605, 610 (4th Cir. 2012) ("A protective sweep is limited to a cursory inspection of those spaces where a person may be found and should last no longer than it takes to complete the arrest and depart the premises." (internal quotation marks omitted)); see also Chimel v. California, 395 U.S. 752, 767 (1969) ("After arresting a man in his house, to rummage at will among his papers in search of whatever will convict him, appears to us to be indistinguishable from what might be done under a general warrant; indeed, the warrant would give more

protection, for presumably it must be issued by a magistrate." (internal quotation marks omitted)).[15]

Nevertheless, Defendants maintain that qualified immunity shields Detective Altizer from Plaintiff's claim. (See Docket Entry 34 at 10-12; Docket Entry 44 at 7-8.) "To establish a qualified-immunity defense, a public official must demonstrate that (1) a plaintiff has not alleged or shown facts that make out a violation of a constitutional right, or that (2) the right at issue was not 'clearly established' at the time of its alleged violation." Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 395-96 (4th Cir. 2014) (internal quotation marks and brackets omitted). However, "[i]f a plaintiff has alleged a clearly established right, summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." Buonocore v. Harris, 65 F.3d 347, 359-60 (4th Cir. 1995). In other words, if "the defendant's entitlement to immunity turns on a factual dispute, that dispute is resolved by the jury at trial." ACLU of Md., Inc. v. Wicomico Cty., 999 F.2d 780, 784 (4th Cir. 1993).

---

15  To the extent Plaintiff challenges the seizure of his apartment pending the arrival of the search warrant and the subsequent seizure of a firearm therein (see Docket Entry 42 at 4), those contentions lack merit under the circumstances, which reflect (1) that officers seized the apartment for at most one hour pending the arrival of the search warrant and (2) that the officers discovered the firearm during the search of Plaintiff's apartment conducted after the search warrant's arrival. See generally Segura v. United States, 468 U.S. 796 (1984).

Here, construed in the light most favorable to Plaintiff, the evidence reflects that, following Plaintiff's arrest and removal from the premises, Detective Altizer searched Plaintiff's mail without a warrant. Such conduct violates clearly established fourth-amendment law. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" (ellipsis in original)); see also, e.g., Buie, 494 U.S. at 335-36 (explaining that "a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found" and may last "no longer than it takes to complete the arrest and depart the premises"). Accordingly, Detective Altizer has not established her entitlement to qualified immunity.

In sum, the Court should deny Detective Altizer's request for summary judgment. See, e.g., Godfrey, 2015 WL 302841, at *5 ("Because genuine issues of material fact thus remain in dispute, [the defendants] have not established that they are entitled to summary judgment on the ground of qualified immunity or on the merits of [the plaintiff's constitutional] claims.").

36

## CONCLUSION

Objective evidence conclusively establishes that Detective McPhatter and Detective Ludemann did not participate in the alleged illegal searches of Plaintiff's mail.  However, material factual disputes exist regarding Detective Altizer's participation in such activity.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 33) be granted in part and denied in part as follows: summary judgment be granted to Detective McPhatter and Detective Ludemann, but denied to Detective Altizer on Plaintiff's fourth-amendment claim for illegal searches of his mail.

This 23rd day of June, 2020.

_/s/ L. Patrick Auld_
**L. Patrick Auld**
**United States Magistrate Judge**
